Good morning, Your Honors, and may it please the Court. My name is Connor Tucker of Irelmanella, appointed pro bono counsel for petitioner by this Court. Thank you very much for your firm and yourself participating in the argument today. I appreciate your recognition, Your Honor. The BIA erred below when it failed to find the petitioner's proposed social groups recognizable. This Court reviews those errors de novo and should reverse. Petitioner is a battered woman and a survivor of repeated rape, and she applied specifically and explicitly on both grounds for asylum. I'll deal with one at a time. Our briefing covers the issues in more detail. I'd like to use my time here before the Court to assess key errors and answer any of the panel's questions. Well, did the BIA address the social group of Central American women who are victims of domestic violence? Your Honor, the framework of ARCG sets out the logic by which a victim of domestic violence would be eligible for asylum based upon that domestic violence. And so the petitioner raised to the BIA that issue, and the BIA considered it, albeit inadequately, when they rejected it, because they did not sufficiently analyze it. If they had sufficiently analyzed it, they would realize that there's no principal distinction between this case and ARCG. The immutable characteristics are the exact same. It deals with gender, women, victims of domestic violence, and the inability to leave. Where do we get inability to leave? Because an ARCG wasn't that part of the actual description of the group, and the group that you've just articulated, Central American women, victims of domestic violence, does not expressly incorporate the idea of inability to leave. The framework of ARCG is designed to assess, the BIA issued it in order to assess how to assess the domestic violence issue. The, sorry, the cognizability of a domestic violence PSG. The court, or the BIA in that case, was very clear that marriage, although an issue, the inability to leave was what made that marriage an immutable characteristic. So the domestic violence in this case, her inability to leave, functions the same way. So I think it subsumed into the particular social group, even though it's not explicitly stated out there. I think you heard the prior argument, and I have the same question for government counsel. I mean, that unable to leave thing doesn't make any sense to me, because they're here seeking asylum, so obviously they were able to leave. So I don't, I mean, the articulation of the group in ARCG just, it can't turn on the ability to leave or not, because as a factual matter, they're already here. So they left, right? I struggle with the same logic, Your Honor. I think that the issue here is that the inability to leave helps us create a social distinction around the group. So they were unable to leave if they had remained, I mean, this, you know, nitpicking these little, if they had remained in their country, and they, I think what they're saying is that if they had remained in their country, they would not have been able to leave the domestic violence situation, because in those certain countries, as a matter of culture or environment or the machismo society, they just, there's no place to go. The police won't stop their abuser. They can't, there's no one that's going to support them, because that's the way it is in that culture, in that environment, in that world. And so they have to leave in order to escape the abuse. They have to get out of that country, because they're not going to be able to escape the abuse in that country. I agree with Your Honor, and I think in this case, we have a particular situation where Petitioner was unable to leave, even after Rene got out of prison the first time. He spent a year intimidating her, threatened to kill her twice on two different occasions for two different reasons. And it was only that he found another partner and that he decided to pull back on his persecution that she was able to, that she was able to, quote, unquote, leave the relationship. But even then, she couldn't leave his stalking and intimidation, as the record, which the immigration judge and the BIA ignored, demonstrates that he continued to do, even after he found a new partner. So I understand the hesitancy with the inability to leave, but I think the, what the court in ARCG was trying, what the BIA in ARCG was trying to do, was delineate the boundaries by which. But they're unable to leave so long as they remain in that country. That's why they have to come to the United States, because they're fleeing the, you know, the persecution there. I think it also connects into the unwillingness of the police to help. So, for instance, in El Salvador, there's uncontested country conditions evidence in this case, which was not addressed by the BIA or the IJ, which indicates that domestic violence is not only under-reported and socially acceptable, but is also under-prosecuted, even though there are specialized courts for this. And that was the case in this country for a very, very long time, until awareness began to change the culture in the United States. For a very long time, police did not enforce domestic violence laws in this country. I'm not aware of that. You should be, Your Honor. You weren't. It was probably before you were born. How do you respond to the record evidence that the police, in this case, was responsive? They had jailed him for eight days, and so there was a specific finding that there's a failure to show the government was unable and unwilling to protect her. So, I think what's interesting about that finding and the BIA's decision is it just flatly contradicted by the record. So, I think Your Honor is referring to, in the administrative record, page 5 to 6, where the BIA finds that she agreed, the Petitioner agreed, to withdraw the, quote, lawsuit, which is, we understand, to be charges. The Petitioner agreed to withdraw the lawsuit if he would leave her alone. And then the BIA says, Respondent agreed and her boyfriend was released after being held for eight days, and so that's the transcript 8, sorry, transcript at 89. The problem is if you go to transcript at 89, you find out that he did not threaten to kill her and she did not withdraw the charges until after he got out of custody. So, the immigration judge to Ms. Munoz-Manchura, and after he got out of custody, did he come to live with you, Petitioner? He left, but he told me that if I didn't withdraw the lawsuit, he was going to kill me and I also had my daughters. So, while the immigration judge and the BIA did make a finding that the police were willing and able to help, the record just flatly contradicts the logic. He got out of jail, and we don't know why, but he got out of jail and then he threatened to kill her if she did not withdraw the lawsuit. And that, the BIA's holding on that is just not supported by any record evidence. It's contradicted by the record evidence, let alone substantial evidence. What do you do with the record? I mean, my understanding of the record is that for a period of years, and I think it's four or five years before she comes to the United States, he's in a different relationship and she's not having problems with him. They don't have an ongoing relationship. They live in a small area, as my understanding. So, they would see each other perhaps out in the public, out in public places, but there wasn't an ongoing relationship. There wasn't ongoing abuse for a period of years before she comes to the United States. So, on that record, how do you establish persecution, you know, a risk of persecution if she's going to go back, and that she needed to flee for that reason? So, I think there's two questions here. The first question is whether or not she established past persecution, which she did. Renee continued to abuse her, threaten her, and intimidate her and stalk her for a year after he got out of jail, precisely because she was a victim of domestic violence and he knew he could get away with it. Then there's the question of whether or not circumstances have changed such that she does not have a reasonable fear of return. And I think that's directly what your Honor is asking about. And the problem is the government has produced no evidence that there is such a change. He's the one who decided to stop. He, it was his decision. There's no evidence. But isn't that a change? There's no evidence in the record that he could not pick it up again if he wanted, pick up the abuse again if he wanted to, or that he could come back. And in fact, the record at AR 149 and 150 clearly indicates that even after he found a new girlfriend, he still was stalking her and he still was intimidating her. Where is that in the record? AR 149 to 50, your Honor. All right. And so the. And for what period of time was she left alone before she left to come to the United States? Was it a period of four or five years? I don't know off the top of my head, your Honor. But a substantial period of time. I would not call four to five years a substantial period of time for someone who has experienced domestic violence and who is experiencing continuing intimidation by their previous domestic partner. So I want to play that argument out just a little bit. I mean, is your position that an abuser would have to be in prison or something to demonstrate a change of circumstances? Because anytime a person voluntarily decides to stop being a bad guy, then that's not good enough? I think even prison would be difficult because the country conditions report indicates that there's an ineffective enforcement of domestic violence laws, laws against domestic violence in El Salvador during this time period. So even after an individual, for instance, was given a restraining order, he still returned immediately and killed his significant other. The country conditions is objective evidence that his existence and his ability to be out in society is a threat to her, that he can return at any moment. And so she has, not only is she entitled to a presumption of a fear of future persecution because of her prior persecution at his hands, but there's no evidence that all of a sudden, El Salvador has turned around on domestic violence and has become an idyllic place for victims of this sort. So this is another problem with the group is to find, this was Central America, Central American women who were abused as opposed to the particular country in which she was from, she was from El Salvador. Yes, Your Honor. Neither the government nor the BIA have, were worried about the breadth of that, but the evidence below is very solidly considering El Salvador. And so there's sufficient, there's significant evidence in the record to suggest that El Salvadorian women who share these social characteristics should be entitled to protection, and of course, Central America subsumes El Salvador. I see that my time is running out, so unless there's any more questions, I'll reserve the rest of my time for rebuttal. Thank you, counsel. Rebecca Huffberg Phillips on behalf of the United States Attorney General again. I have to correct a factual, I have a few factual corrections. It's quoted 149 to 150 that her abuser kept bothering her. And after he found a new partner, did he leave you alone? Answer, yes. And you never heard from him again, is that correct? Whenever, answer, whenever he saw me, he didn't talk to me and I didn't either. Okay, and I also filed a 28J letter last week, pointing out that the facts of this case, regardless of, you know, incidents before that for four to five years, as Judge Hunsaker noted, that there was no problem at all living in the same location with her abuser, because he had moved on to a new partner. So I want to say, first and foremost, that that is a key fact in this case, with respect to any threat of harm at this point. I do want to point out another few. He says that there was a factual error with the police and the unable and willing, and I'd like to direct the court to the transcript issue. This is around pages 140 and 141. She says she agreed to drop the charges because her ex-partner said that he would leave her alone. There was no threat. It was an agreement between them. Then she said after he was released, he did not come back and live with her. He said, she said that he told her she had to withdraw the lawsuit or he was going to kill her, but it appeared that it had already been dropped because that was a condition of his release. So that part doesn't make sense to me. I would say that that is somewhat ambiguous at best in the record, in terms of, was it already dropped and then he threatened her? Because the way she presented it on page 140 is she agreed to drop it because he said he was going to leave her alone and there was no threat involved. But in any event, the point here is she never went back to the police in terms of the unable unwilling. If he threatened her after he was released and he said I'm going to come after you now, where is the evidence that the police were unable or unwilling to help her? They promptly arrested and detained him upon her complaint and only released him seemingly because she agreed to allow the charges to be dropped. And if that was in dispute or there was any problem and she was being threatened, she could have gone back to the police. And we could have seen what the police were able and willing to do. Never once in this record do you hear her say that she went back to the police, or do you say, or does she claim that it would have been futile? And the facts of this record do not show it would have been futile, because you have the ability and I also want to point out that this case can also be decided with respect to the unable and willing component on the rape side of her claim. I want to clarify the record there. In her testimony, she says that when she, and she had two social groups. Just to be clear, I know we were focusing on domestic violence. And here, in this case, she had a domestic violence-based one and a rape one. And in both cases, we see evidence of ability and willingness to protect. And that's a dispositive basis apart from Nexus particular social group issues. And I just explained the ability and willingness to protect on the domestic violence with respect to the rape part of this. What I want to point out is that on pages 125 to 129 of her testimony, she says that when she came back after the second rape, they told her that she had to get a medical examination. She waited a month and apparently went to whatever examination she was supposed to get. Found out she was pregnant and did nothing further because she knew her rapist had left for the United States at that point and did not follow up and never went back to the police with the medical examination. Now, I understand that this conflicts with her written statement on page 259 where she says police required same day reporting of a rape and therefore they weren't willing to take her rape complaint. That's in her written statement. That was not in her testimony. And her testimony was credited as saying, I was told to come back with the medical exam, but I chose not to because my rapist had already left for the US and I had found out that I was pregnant. There's also a slight contradiction there. She says it was a month later in her testimony and in her written declaration, she says she went three months without a period and that's how she found out she was pregnant. There's tension there. My point is that regardless, she's not showing that she followed through with getting that medical examination that the police asked her to go do and she gave up because her rapist had already left for the United States and she did not pursue it further. So I want to just make clear that the able and willingness of the police to protect is a separate dispositive basis for both of her claims in this case. And now turning to the other part of her case with respect to the social groups. In this case, with respect to the rape claim, you do have the typical social distinction element here. With respect to the domestic violence claim, the factors used here, in addition to unable and willing, was the circularity component here in terms of how it was defined in the sense that it was defined by the harm suffered. As I mentioned earlier, when you're talking about the harm that was suffered, in this case, the domestic violence, the violence is both the harm and the cause of the harm. And the problem with circularity in this case is that you can't, it creates what we call the impossible nexus problem because it reverses the cause and effect as I was stating before. And as I also mentioned, you can't do the surgery on the group to make it a non-domestic violence particular social group. And in this case, it was also based on Central Americans who had been subject to domestic violence. I understand that the actual bases used here were with respect to, not so much looking at the Central American factor, but with respect to the circularity of domestic violence. And so the government is looking for this court to weigh in on the fact that circularity of the way a group is defined creates this really big problem. And- We have weighed in on that. I've read a number of opinions from our circuit that follow that principle. But I think the thing that is different in this situation isn't, that takes it out of the circularity is that there's this culture of victimhood. Like that once you've been a victim of domestic violence or rape, repeated rape by gangs, that you're, in fact, because you're a victim, you've been a victim before, it sort of emboldens or enables other people to follow suit. And there is that that exists, I think, is why ARCG came out the way it did on that. Your Honor, I just want to point out that that's what this claim morphed into, was this vulnerability to have something happen again. It's not the way it was presented to the agency. I'm saying, okay, put it aside. Yeah, okay. I'm saying as a, I mean, to try to make sense of this law that's developed, there is that that distinguishes victims of domestic violence or victim of repeated rape from just like one time incident. Well, Your Honor, a vulnerability to crime, the problem is- No, not in the abstract. I'm sure you've read about domestic violence and the mentality that comes. And I mean, there's experts that testify about it all the time. So you know what I'm talking about, right? Yeah, I mean, this case doesn't present those circumstances. Right, I'm just thinking for- Yeah, I understand if you're trying to look at bigger picture things, and I just think this isn't the case to do that. Because this case has its own set of facts that I will say are quite unique. Because in many of these domestic abuser cases, we don't see the abuser saying, bye-bye, I've got my new partner, off with you, right? I mean, that's what we have here. So we don't have this perpetual cycle of, he promptly moved out when she asked him to and after she went to the police and they did their job. And as I was saying before, he may have gone to, there's some discrepancy again. Like did he, was he still stalking her? Was he trying to get back together? Right, but you understand why we have to consider the big picture as judges and where the law is developing, right? Yes, Your Honor. I just think that a case with different facts might be a better case to look at a bigger picture, systemic domestic violence. This case presents facts that are showing a lot of things that are different than typical, maybe domestic violence cases. Because as I see it here, I don't always see such effective police behavior. I agree with Your Honor, I was pleasantly surprised. The police did what they were supposed to here. And everything happened the way that you would expect it to. And so in the end, she lived five years in this country, right in the same town as her abuser with no problem because he had moved on. And she had her own life. And then she describes some little bit of gang interaction with her daughter and that's what prompted them to leave. It wasn't actually the domestic abuser that in the end she left to come here. I believe it was 2014 because she was saying her daughter started getting some issues with the gangs, which never ended up turning into any big part of her claim. But her reason for leaving was not even directly related to the domestic abuse situation that she had struggled with years prior. I also want to point out that in this case, the evidence shows that the abuse began because her ex-partner had a drug problem. And this is on page 135. And so I want to point this out because again, it's not the typical domestic abuse where you say it's something systemic in society with this male culture. She specifically says that he never mistreated her before 2006. This is on page 136. It started with a drug problem. So he got a drug problem. He started abusing her, you know, and then she ultimately went to the police. They detained him, arrested him. He was released. Maybe, like I said, did she agree to it? Did he threaten her afterwards? I don't know. Never went back to the police. For the next year, he came to her work. Unclear if he was trying to get back together with her, if he was threatening her. Again, never went to the police to try to do anything about that. And what we know is since December 2008, beginning in January 2009, she had no problems with him for the next five years. So that is absolutely, you know, a prime consideration in this case, regardless of domestic violence situations in other cases that I urge the court not to consider for this particular case. I do want to point out that, you know, in this case, regardless of the comparison to ARCG or not, at the time that these agency decisions were being decided, it was very confusing on the role that matter of ARCG should play. Nobody really understood. Well, we know we have a domestic violence case. What do we need to do about it? And what we realize now is that you always have to apply these MEVG WGR criteria. That criteria was actually not applied to the domestic violence claim in this case. And that's because they used an unable unwilling ground and a circularity basis for this. And so those are the grounds that were used. So again, we don't have like the social distinction considerations about domestic violence are not before the court in this case because the agency didn't use that basis. Nowadays, when domestic violence claims in other cases are raised, the whole MEVG WGR factors are gone through so that you can make sure that it meets particularity, social distinction, immutable characteristics. Well, was the BIA supposed, I mean, the BIA did not adopt the IJ's decision in this case. Did it actually consider the social group? Yes, Your Honor. The government's not really putting forth the exhaustion. We do agree that to the extent that the exhaustion argument was made, it was more because of her perfunctory administrative appeal brief. She has new counsel before this court that this court appointed. And so the problem is when you change counsel from before the agency to before the court, a lot of additional new arguments are being raised. Appoint better counsel than she had before. Yes, Your Honor. But the problem is that these, a lot of the arguments, again, like being more susceptible to rape or anything like that, those weren't before the agency. So in terms of her articulation of her social group, she made a reference. And I think I know where the problem, if you look at page 158 of the record, she actually says she's relying on matter of RA framework after her social group. And then before the board in her appeal brief, she then references, I have these two articulated social groups. And also, by the way, the matter of ARCG framework is also relevant here. And so to me, I think that she just raised it in a very perfunctory manner, but the board affirmed the IJ's decision. So. Didn't adopt it. It applied its own reasoning. And I'm just wondering. Yeah, so there were only two reasons given by the IJ. It was, well, if you count, if you don't count ARCG, it was circularity and unable and unwilling. So that's what the government is arguing. The domestic violence claim should be decided on either of those two grounds. They're both dispositive there. Each of them are. So. Circularity fall in the sort of hierarchy of things that have to be proven. Because I think of that more as a nexus argument. But my recollection is that on that domestic violence group, that the agency didn't actually take up the nexus. They spoke for particularity. Your Honor, I totally agree that circularity is completely tied up with the nexus problem, but it is its own sort of it's as a matter of law, whereas nexus is a factual issue. As a matter of law, what the what the attorney general made clear, it was already suggested in matter of MEVG. And it said your group has to exist apart from the persecution. But until matter of AB came along, it wasn't, the nail wasn't sort of driven in as much to say, you shouldn't define, if you come to the US and you say, here's what happened to me, give me relief. That's the problem with circularity, is it's defined by your own circumstances. And so, this is textbook circularity. If there ever was something to give the court a great example of what circularity means. Her groups are, I was repeatedly raped and the police were unable and unwilling to help me. That's a particular social group. So, in other words, the exact harm that she suffered is now the basis for the harm that she suffered. And it reverses the cause and the effect. And it creates what we call the impossible nexus problem. And this is true for both of her groups, because it describes the harm that she experienced. And I see that my time is up. But if the court has any further questions, I'm happy to answer them. Otherwise, the government will rest on its brief. Thank you. Thank you, counsel. Your Honor, with the short time I have on rebuttal, I'd like to address a few points that the government has made. First, the government appears here to be blaming the victim for her own persecution. That she did not go to the police again, or that even when he continued to stalk and harass her after he found a new partner, that she did not go again. It does not negate the fact that she experienced past persecution and is entitled to a presumption of fear of future persecution. But also, she didn't go to the police for the reasons the country conditions report, which the IJ and the BIA are required to look at and did not look at. Which demonstrates that it would have been futile for her to go, because domestic violence is under-prosecuted and it's under-enforced. So it's just, I'll move on from there. The second, I'd like to turn to the circularity argument. Actually, first I'd like to turn, because I didn't have time in my opening to talk about the rape PSG. I'd like to turn to the police's, the independent issue that the government raised, which is the police's purported willingness to help. This is perhaps the most galling of the factual mistakes made by the IJ, where the IJ says that she never really cooperated. This completely ignores the country conditions report. In El Salvador, the police are required by law to prosecute every single rape case, regardless of whether charges are pressed and regardless of whether the victim wants to do, wants to pull the charges away. So the police, despite this legal obligation to prosecute this rape case, gave one of two reasons not to. She didn't go to get the exam, and in fact she did go to get the exam. That's how she found out she was pregnant, which the government brought up to you. And second, because she did not report on the same day, they found pretexts to avoid a legal obligation to investigate and prosecute the rape cases. That is textbook unwillingness to help. I'd like to turn to the circularity issue very quickly here. The BIA has never required complete independence between persecution and the particular social group. And in fact, in MEVG itself, the BIA held that where the harm catalyzes social distinction of the group, it's not impermissibly circular. Now, the government in their brief cites to note 11 in MEVG. The problem with note 11 is that the BIA there noted that the DHS was advocating for an independent requirement of asylum cases that the harm be independent from the PSG. The BIA rejected the DHS's request there in note 11, and then went on to articulate in the text of MEVG that the question is whether or not it's exclusively defined. And here, on either of the two particular social groups, the persecution is not coextensive with the harm that was suffered regarding rape. Not only did she experience repeated rape, yes, she did experience that, but she also had death threats that were sent to her grandfather and her brother, and they attempted to kidnap her. And they told her they were going to kidnap her. The fact that she was able to escape at 3 o'clock in the morning with her mother does not negate the fact that she experienced past persecution precisely because they knew that she had a transformed status. She had a badge on her back. She had a scarlet letter, for lack of a better term, because she had been repeatedly raped and they viewed her as theirs to own. The same thing with domestic violence. Domestic violence is not the only harm she experienced, and it also included stalking and intimidation, which went even beyond the time that he had a new girlfriend. And I see that my time is up. If regarding the breadth of the social group, if there's any questions, we urge this court to remand if they're concerned about the articulation of the breadth of the group. And with that, we'll rest on our briefs. Thank you very much. All right. Thank you very much, counsel. Again, thank you for accepting the pro bono appointment, Irela Manela. And Munoz Ventura versus Barr will be submitted. Thank you very much.
judges: Wardlaw, Nguyen, Hunsaker